| AO 91 (Rev. 11/82) | CRIMINAL COMPLAINT | ORIGINAL |
|---|---|---|

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>OMAR ERNESTO HERNANDEZ | DOCKET NO. |
|  | MAGISTRATE'S CASE NO.<br>**MJ 17-1881** |

Complaint for violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii): Transporting Illegal Aliens Within the United States

| NAME OF MAGISTRATE JUDGE<br>**HONORABLE ANDREW J. WISTRICH** | **UNITED STATES MAGISTRATE JUDGE** | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>July 26, 2017 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On or about July 26, 2017, in Los Angeles County, within the Central District of California, defendant OMAR ERNESTO HERNANDEZ ("defendant"), knowingly transported aliens, who had come to, entered, and remained in the United States in violation of the law within the United State, by means of transportation and otherwise, in furtherance of such violation of law.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED: (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>GLORIA MARRUFO-EVANS |
|---|---|
|  | OFFICIAL TITLE<br>Special Agent, Border Patrol |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>July 27, 2017 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA KATHERINE A. RYKKEN         REC: DETENTION

LODGED
2017 JUL 27 PM 3: 15
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY ___


CLERK, U.S. DISTRICT COURT
JUL 27 2017
CENTRAL DISTRICT OF CALIFORNIA
BY ___

## AFFIDAVIT

I, Gloria Marrufo-Evans, being duly sworn, hereby depose and say:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant for Omar Ernesto HERNANDEZ ("HERNANDEZ"), charging him with a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii): Transporting Illegal Aliens Within the United States.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents and investigators.  This affidavit is made for the sole purpose of demonstrating probable cause for the issuance of this criminal complaint and search warrant and does not purport to set forth all of my knowledge of this investigation.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part.

### II.   BACKGROUND FOR AGENT GLORIA MARRUFO-EVANS

3.   I am a Border Patrol Agent with the United States Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection ("CBP"), United States Border Patrol ("USBP"), and I have been so employed since July 14, 1997.  I am currently

///

///

assigned to the Targeted Enforcement Unit at the Murrieta Border Patrol Station, enforcing the immigration laws of the United States.

4.  While employed as a Border Patrol Agent, I received formal training in immigration laws and enforcement, as well as training through my experience and conversations with other law enforcement agents with whom I have worked.  I have conducted and participated in numerous investigations, as well as searches, the execution of arrest warrants, and prosecutions of criminal violations.

### III. STATEMENT OF PROBABLE CAUSE

**A.    Background in Smuggling Operations**

5.  Based on my training and experience, I am aware that alien smuggling operations typically operate as follows:

   a.  The laws of the United States require that all persons entering the United States present themselves and their goods at an authorized Customs and Border Patrol ("CBP") Port of Entry to be inspected by CBP officers.

   b.  Smuggled aliens are often brought from areas in Mexico, near the United States-Mexico border, by alien smugglers who intend to bring them illegally into the United States.

   c.  The smugglers conceal the smuggled aliens inside vehicles and vessels to be transported through the official

United States Border checkpoints without presenting the aliens for inspection and identification.

   d. Once inside the United States, the persons being smuggled are then typically transported to locations known as "drop houses." Accomplices at the drop house will contact the family of the illegal alien for completion of payment prior to releasing the individual. Many such drop houses are located in the Inland Empire and the greater Los Angeles, California area.

   e. The alien smugglers hold the smuggled aliens at these drop houses until their relatives and/or friends pay the alien smugglers a smuggling fee for their release.

   f. The alien smugglers make contact with the relatives and/or friends to obtain the fees necessary for the release of the smuggled aliens.

   g. After the smuggling fees are paid, arrangements are made for the delivery of the smuggled aliens to their friends and/or relatives.

   h. Those arrangements consist of alien smugglers driving the smuggled aliens to easily accessible areas in public, such as fast food restaurants and convenience stores, where they are delivered to their friends and/or relatives. Alternatively, alien smugglers drive the smuggled aliens to transportation facilities such as bus terminals, train stations, and airports, where the smuggled aliens obtain transportation to

their ultimate destination within the United States.

### B. The Investigation

6. Based on my investigation as well conversations with other law enforcement officers involved in the investigation, I know the following:

    a. On July 26, 2017, at approximately 6:00 p.m., United States Border Patrol agents were working within the Murrieta Border Patrol area. This area is located approximately 70 miles from the United States/Mexico International Border, in Murrieta, California. Border Patrol Agents Juan Aguayo and Richard Hagan were watching traffic on Interstate 15 ("I-15") near Murrieta Hot Springs Road. Agents Aguayo and Hagan were in a marked United States Border Patrol Ford Explorer (the "Explorer") and wore tactical vests identifying them as Border Patrol Agents. Agents Aguayo and Hagan saw a black BMW sedan, bearing California license plate 6CKV924 ("the BMW"), traveling in the fast lane of traffic. As the BMW passed Agents Aguayo and Hagan, the BMW slowed down significantly, causing cars behind it to switch lanes. Most cars do not decrease their speed at the sight of a Border Patrol car because the motoring public knows that Border Patrol does not issue citations for traffic violations.

    b. Agents Aguayo and Hagan followed the BMW, with

Agent Aguayo driving. Agent Aguayo maneuvered the Explorer into the lane next to the BMW. The BMW was still going well below the speed of the flow of traffic. Agent Aguayo paced the BMW for approximately two miles at an approximate speed of 60 mph. The speed limit is 70 mph. Agents Aguayo and Hagan saw four occupants in the BMW, two in the front and two in the back. Border Patrol later identified the driver as HERNANDEZ and the three passengers, two women and one man, as L.J.A.U., M.A.D., and J.G.H.D.

       c. Agent Hagan checked for border crossing records related to the BMW, using the mounted laptop in the Explorer. Record checks showed that the BMW had crossed the international border through the Tecate, California Port of Entry earlier that day, at approximately 1:03 p.m. The sole occupant of the BMW at that time was HERNANDEZ. Agent Hagan also discovered alerts on both the BMW and HERNANDEZ identifying both as high risk for human smuggling.

       d. Agent Aguayo slowed down and followed the BMW. The BMW continued to drive at approximately 60 mph in the fast lane, impeding the flow of traffic. When Agent Aguayo positioned the Explorer behind the the BMW, HERNANDEZ began swerving within his own lane of travel. Agents Aguayo and Hagan believed the swerving was caused by HERNANDEZ looking in his rear view and side mirrors at the Explorer.

### C. The Stop and Arrest

7. Based on my investigation as well conversations with other law enforcement officers involved in the investigation, I know the following:

   a. Agents Aguayo and Hagan believed the BMW was involved in a smuggling event and stopped the BMW on I-15, near Bundy Canyon Road. Agent Aguayo approached the car from the passenger side and identified himself and Agent Hagan, speaking in English. HERNANDEZ, who was in the driver's seat, said that the passengers, L.J.A.U., M.A.D., and J.G.H.D., did not speak or understand English. Agent Aguayo then identified himself and Agent Hagan as a Border Patrol Agent, speaking in Spanish.

   b. Agent Aguayo questioned HERNANDEZ about their destination. HERNANDEZ said that they were in route to California. Agent Aguayo told HERNANDEZ that they were currently in California and HERNANDEZ replied that he was aware of it and provided that answer only because he was nervous. HERNANDEZ then said that they were actually in route to Los Angeles, California to visit family.

   c. Agent Aguayo asked HERNANDEZ how he knew the occupants of the the BMW. HERNANDEZ said that they were his family members. HERNANDEZ provided names for the passsengers, Juanes, Robert, and Jonas, which Border Patrol later determined

6

were fictitious names. L.J.A.U., M.A.D., and J.G.H.D. freely admitted their true names and that they were citizens of Mexico illegally present in United States without immigration documents that would allow them to be or remain in the United States legally.

    d. Agent Aguayo told L.J.A.U., M.A.D., and J.G.H.D., that they would be taken into Department of Homeland Security custody for being in the country illegally. Agent Aguayo told HERNANDEZ that he was under arrest for alien smuggling.

    e. Border Patrol transported HERNANDEZ, L.J.A.U., M.A.D., and J.G.H.D. to the Murrieta Border Patrol Station for further processing.

**D.  Interview Statements**

8. On July 26, 2017 at approximately 8:35 p.m., Border Patrol agents interviewed HERNANDEZ. Based on my personal observations and speaking with other agents involved in the interviews, I know the following:

    a. Border Patrol Agent Omar Gomez read HERNANDEZ his Miranda Rights. HERNANDEZ chose to answer questions without the presence of an attorney. When asked, HERNANDEZ declined to say whether L.J.A.U., M.A.D., or J.G.H.D. had information favorable to him.

      b.    HERNANDEZ said that he was putting gas in his car at a gas station off of State Route 78 near Oceanside, California when L.J.A.U., M.A.D., and J.G.H.D. approached him and asked for a ride.

      c.    HERNANDEZ was told that he had been seen in Jacumba, California earlier that day, near the border. HERNANDEZ said that he had visited a casino in Jacumba, California area earlier in the day. Border Patrol Agents explained that a casino does not exist in Jacumba. At this time, HERNANDEZ chose to stop answering questions without an attorney present.

9.    On July 26, 2017 at approximately 10:00 p.m., Border Patrol agents interviewed L.J.A.U. Based on my personal observations and speaking with other agents involved in the interviews, I know the following:

      a.    L.J.A.U. is a Mexican citizen and admitted that she did not have permission to be in the United States. She paid approximately $7,000 USD to be smuggled. L.J.A.U. said that HERNANDEZ knew that L.J.A.U., M.A.D., and J.G.H. were illegal aliens.

      b.    L.J.A.U. identified HERNANDEZ as the driver of the BMW from a photo line-up. She said that they were told to meet HERNANDEZ on a two-lane highway, after crossing the border in a mountainous area. L.J.A.U. said that they received

information from cell calls that M.A.D. and J.G.H.D. were carrying.

10. On July 26, 2017 from approximately 9:00 p.m. to 10:00 p.m., Border Patrol agents interviewed M.A.D. Based on my personal observations and speaking with other agents involved in the interviews, I know the following:

    a. M.A.D. is a Mexican citizen and admitted that she did not have permission to be in the United States. She paid $8,000 USD to be smuggled.

    b. M.A.D. identified HERNANDEZ as the driver of the BMW from a photo line-up. She said that they were told to meet HERNANDEZ after crossing the border.

11. On July 26, 2017 from approximately 9:00 p.m. to 10:00 p.m., Border Patrol agents interviewed J.G.H.D. Based on my personal observations and speaking with other agents involved in the interviews, I know the following:

    a. J.G.H.D. is a Mexican citizen and admitted that he did not have permission to be in the United States. He paid $7,000 USD to be smuggled.

    b. J.G.H.D. identified HERNANDEZ as the driver of the BMW from a photo line-up. J.G.H.D. was given a cell phone before crossing the border and used it to communicate with someone giving them directions. They were told to meet HERNANDEZ on small paved highway after crossing the border.

## IV. STATEMENT OF PROBABLE CAUSE

12. Based on the foregoing, I submit that there is probable cause to believe that HERNANDEZ transported illegal aliens within the United States, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii).

_____
Gloria Marrufo-Evans,
Border Patrol Agent,
United States Border Patrol

Subscribed to and sworn before me
this 27th day of July, 2017.

_____
HONORABLE ANDREW J. WISTRICH
UNITED STATES MAGISTRATE JUDGE